## BAMBERGER *v.* SCHOOLFIELD

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ALABAMA.

No. 48. Submitted April 11, 1895. — Decided December 9, 1895.

It was not the province of the court to instruct the jury in this case to render a verdict in the plaintiffs' favor, and had it done so it would have usurped the province of the jury, by determining the proper inference to be drawn from the evidence, and by deciding on which side lay the preponderance of proof.

As the controversy below in this case was what is known in the jurisprudence of Alabama as a statutory claim suit, growing out of attachment proceedings, the law of Alabama, as interpreted by the Supreme Court of that State in its rulings, will be followed here.

Under the law of Alabama a debtor has the right to prefer a creditor, either by paying his debt in money, or by paying it by a sale and transfer of property to the debtor; and if such sale and transfer are real, and are made in good faith, for a fair price, if they are honestly executed to extinguish the debt and do extinguish it, and contain no reservation of an interest or benefit in favor of the vendor, they are valid, and pass the property to the vendee, even if it further appears that the vendor was insolvent at the time, that the vendee knew that fact, and that, in making the sale the vendor had a fraudulent intent to defraud his other creditors by the preference, and the remaining creditors would, in consequence of the sale, be unable to obtain the payment of their debts.

In such case if the fact of indebtedness, and the fact that the goods were sold in payment thereof at their reasonable fair value are established to the satisfaction of the jury, and if it be contended, in avoidance thereof, that the trade was simulated, and that there was a secret trust or benefit reserved to the debtor, the burden is on the contesting creditor to establish it.

The employment of such a vendor by the vendee in a clerical capacity, and the subsequent transfer of the property by the vendee to the wife of the vendor, though circumstances which may be considered by the jury in determining the validity of the sale and transfer, do not of themselves render them illegal in law.

When a request for instructions presents a suppositious case, for the establishment of which there is no proof of any kind in the case, it should be refused.

The second section of the fourteenth article of the Constitution of Alabama, and the act of the legislature of that State of February 28, 1887, have been held by the courts of Alabama as not intended to interfere with matters of commerce between the States, and to have no application to transactions such as here under consideration.

There was no error in the instructions as to the bearing on the rights of the parties of the letter written by the Memphis firm and the settlement made by the latter after it.

THE controversy below was what is known in the jurisprudence of Alabama as a statutory claim suit, and grew out of an attachment proceeding instituted by plaintiffs in error against one Henry Warten. Under the writ, a levy was made on certain merchandise, treated as belonging to Warten. The defendants in error intervened and claimed the things seized, and thereby an issue was formed as to whether they were owned by the defendant in attachment or were the property of the claimants. The undisputed facts are as follows: Henry Warten embarked in trade at Athens, Alabama, in 1881; his business consisted of a general country merchandise store, of

advancing to farmers money or provisions wherewith to culti-
vate and market a crop of cotton, of buying and selling cotton
on his own account and as agent for others. Almost at the open-
ing of his career at Athens, Warten began a course of dealings
with the commercial firm of Schoolfield, Hanauer & Co. of
Memphis, Tenn. (whom we designate hereafter as the Memphis
firm); they became his general factors, selling him merchan-
dise, loaning him money, cashing his sight drafts, given to others
in payment of merchandise bought by him or for debts due,
he consigning them cotton for sale, the proceeds passing to
the credit of his account. This course of dealing continued
until April, 1889, when the Memphis firm went into liquida-
tion. There was then formed, under the laws of Tennessee, a
corporation styled the Schoolfield Hanauer Company, desig-
nated hereafter as the Memphis company, with whom Warten
carried on business of the same general nature as that previ-
ously conducted with the firm.

The cotton crop of 1889, in the region of country where
Warten dealt, was a disastrous failure, and in consequence of
this fact, by the month of December of that year, Warten had
a large amount of outstanding debts due him by unsecured
accounts, which were either permanently lost or were unavail-
able as quick realizable assets. At this time he owed a large
amount of money for merchandize and for money borrowed
during the course of his business. This condition of things
produced disorder in his affairs and a state of actual, if not ulti-
mate, insolvency. By the 20th of December, 1889, Warten
owed the Memphis firm a considerable debt, evidenced by four
notes, three of which were dated May 22, 1889, two for $5000
each were past due, one for $3794 was to become due on
January 1, 1890, the other for $2500 was dated June 10, 1890
and had also matured.

The last-mentioned note (dated June 10, 1890) had been
made by Warten to the order of the Memphis house, was
by it endorsed, and had been discounted by the Memphis com-
pany, who put the proceeds to the credit of Warten, he there-
after drawing against the credit to the full extent thereof.
Warten at that time also owed the firm of Bamberger, Bloom

& Company, of Louisville, hereafter called the Louisville firm, a past-due note, amounting to $4719.36 and an open account, both together making the total of his indebtedness to that firm between six thousand five hundred and seven thousand dollars. The embarrassed condition of Warten's affairs was known to the Memphis and the Louisville firms. Late in December, after conferring with his creditors in Memphis, Warten went to Louisville for the purpose of asking an extension from the Louisville firm, and delivered to them the following letter:

"MEMPHIS, TENN., *December* 27, 1889.
"MESSRS. BAMBERGER, BLOOM & COMPANY,
"*Louisville, Ky.*

"DEAR SIRS : Our mutual friend and customer, Mr. Henry Warten, through, we believe, no fault of his own, but owing to disastrous failure of crops in his own section, finds himself forced to ask for extension of his particular friends, and he recognizes you among that number and from whom he can ask that favor. Having confidence in his honor and integrity and business qualifications, we have agreed to give him extension, provided you will do so. He informs us that one of his creditors has agreed to give him extension and he will only ask it of three houses, viz., yourselves, ourselves, and the party who has agreed to.

"Yours very truly,
"THE SCHOOLFIELD HANAUER CO."

After arriving at Louisville, Warten telegraphed the Memphis company that the Louisville firm refused the extension unless he paid three thousand dollars in cash, and the company replied that they could not give him the money. A settlement was made on the 30th of December between Warten and the Louisville firm, by which the outstanding past-due note was taken up, and Warten furnished an acceptance due on the 15th of January for one thousand dollars, and four other acceptances for five hundred dollars each, maturing on the first and fifteenth of February and first and fifteenth of March following, and the balance of the debt, except an item

of about two hundred dollars, was settled by acceptances maturing the following November and December. At the time of making this settlement or thereafter (up to the 13th of January) the Louisville firm made no reply to the letter from the Memphis firm. From January 1 the embarrassment of Warten became rapidly more flagrant, in consequence of the results of the crop disaster becoming absolutely assured. On the 13th of January, 1890, at about six o'clock in the morning, Warten sold to the Memphis firm his stock of goods, safe, and store fixtures at Athens, with also a small stock and store fixtures owned by him at Elkmont, and certain accounts, a lot of mules, and an interest in real estate, for the price of $17,032.40, this being the amount of the principal and interest of the notes held by the firm, which have been already mentioned. The sale was accepted in full acquittance and discharge of the debt. A member of the firm, who had come from Memphis, took possession of the property. On the same day Warten sold to the Memphis company certain assets in full payment of an open account due by him, and other transfers of assets in payment of other debts, to various creditors, were also made at or about that time. On the same day as the sale to the Memphis firm, (13th of January, 1890,) between eleven and twelve o'clock, Warten made a general assignment of all but his exempt property in favor of his general creditors; the assets covered by this assignment being open accounts due him, and the remaining avails of his business, amounting to the face value of about $50,000, the claim of the creditors, in whose favor this assignment was made, including that of the Louisville firm, aggregating about fifteen thousand dollars. Of the accounts assigned, about thirty thousand dollars were debts due Warten for business of the current crop year.

A few days after this sale the Louisville firm attached the stock of goods in the Athens store as being yet the property of Warten. The Memphis firm claimed the property seized and bonded it, thus raising the issue to which we have in the outset referred. After the sale by Warten to the Memphis firm, he acted as an employé in the store, generally assisting

in the conduct of the business, continuing to do so until the 10th of June, 1890, when what remained of the stock and some other of the property which had been sold to the Memphis firm was resold to the wife of Warten. Although there is no dispute as to the foregoing facts, on every other question of fact there is conflict. The claimants' evidence, tended to show that the sale by Warten to them was real, was made for a just price, and that it absolutely extinguished their debt, and that no benefit or expected benefit was expressly or impliedly reserved to the seller; that actual delivery was made of the property sold, and that they were in possession as owners at the time of the attachment; that the employment of Warten was simply in a clerical capacity and was rendered advisable from his knowledge of the business and consequent ability to assist the vendors in converting the stock and assets into cash. On the other hand, the evidence of the attaching creditor (the Louisville firm) tended to show by a mass of circumstances that the sale was intended to and did reserve a benefit to Warten; that his presence in the store after the sale, while ostensibly in the capacity of an employé, was really in that of an owner or of one having an expectancy of ownership. As to the facts connected with the settlement made by the Memphis firm, there was also much conflict in the evidence, Warten swearing that when he presented the letter from the Louisville firm the extension to the next crop year asked by him was refused, unless he paid three thousand dollars cash, and that it was in consequence of this demand that he telegraphed the Memphis company that the Louisville firm refused the extension and asked three thousand dollars; that when he could not procure the amount of the cash payment demanded, then the settlement was effected, the short term acceptances for three thousand dollars having been given by him as an equivalent of the cash demanded, the remainder of the debt, except a small sum, having been extended to the next crop season. On the other hand, the testimony of a member of the Louisville house was that no demand of cash was made and that the extension asked by Warten was granted, without objection, and was evidenced by the acceptances.

There was a verdict for the claimants, (the Memphis firm,) and the seizing creditor (the Louisville firm) prosecutes this writ of error, on which he assigns thirty-six errors, twelve of which are predicated on erroneous rulings asserted to have been made in admitting or rejecting testimony, and the others are directed to the charge of the court to the jury. Only a fragment of the general charge is in the record. Each party, however, presented a series of requests stating the propositions of law which they respectively deemed applicable to the facts, and all the errors assigned growing out of the charge of the court involve the correctness of the court's action in having substantially given the special charges asked by the claimants (the Memphis firm) and rejecting those presented by the attaching creditor (the Louisville firm).

*Mr. Milton Humes* for plaintiffs in error.

It is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether, on all the evidence, the preponderating weight is in his favor — that is the business of the jury — but, conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court after a verdict to set it aside and grant a new trial. Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which the plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff that verdict would be set aside and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be, that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury.

This is the rule of practice, as we understand, prescribed by this court for the trial court in all cases, and the principle is especially applicable to the case of the plaintiff and the

defendant. When a creditor shows facts that raise a strong presumption of fraud in a conveyance made by his debtor, the history of which is necessarily known to the debtor only, the burden of proof lies on him to explain it, his estate being involved. *Clements* v. *Moore*, 6 Wall. 299.

It is proved without conflict and it is conceded that the debt of the plaintiffs was contracted prior to the transfer we are assailing. This fact appearing, the onus of proving that the transfer was not merely voluntary but founded on an adequate and valuable consideration is, consequently, by law cast on the claimants. Whatever may have been the motives of the parties in its execution as to creditors whose rights were existing, these deeds and transfers must be regarded as merely voluntary, and they must be presumed to be fraudulent until the contrary is shown. *Hubbard* v. *Allen*, 59 Alabama, 283.

Judges are no longer required to submit a case to the jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that would warrant the jury to proceed in finding a verdict in favor of the party introducing such evidence. *Commissioners of Marion County* v. *Clark*, 94 U. S. 278.

On the trial of a statutory claim suit, and that is what this suit is, the plaintiff must first make out a *prima facie* case of liability to his execution or attachment; and when he has done this, the onus is devolved on the claimant to establish a valid title in himself as against the plaintiff. *Foster* v. *Goodwin*, 82 Alabama, 384.

When transactions such as the one at bar are assailed as fraudulent the material inquiries are directed to the existence and validity of the debts, the sufficiency of the consideration and the reservation of a benefit to the debtor. In a case such as the present the burden of proving the existence of these essentials is cast upon the claimant. *Moore* v. *Penn*, 95 Alabama, 200; *Hodges* v. *Coleman*, 76 Alabama, 103.

In the race of diligence the creditor who seeks to become preferred must do no more than, by fair methods, obtain

payment of his own claim. If he go further and secure a benefit to the failing debtor, this taints the whole transaction. *Seamen* v. *Nolen*, 68 Alabama, 463; *Levy* v. *Williams*, 79 Alabama, 171.

If by the transaction the failing debtor secured to himself a paying employment which but for the sale he would not have had, this was a benefit reserved, which renders the transaction fraudulent. *Lukins* v. *Aird*, 6 Wall. 78; *Harmon* v. *McRae*, 91 Alabama, 401; *Page* v. *Francis*, 97 Alabama, 379; *Stephens* v. *Regenstein*, 89 Alabama, 561.

If the court should disagree with us in the foregoing portion of our argument, and conclude that the testimony should have been submitted to the jury, then we say that the sufficiency of the circumstantial evidence was not properly presented to the jury, but, on the contrary, the manifest tendency of many of the special charges asked by claimants and given, was to create the impression upon the jury that evidence of a more positive and direct character was required. This was erroneous.

*Mr. F. P. Poston* and *Mr. Lawrence Cooper* for defendants in error.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

In the discussion at bar the plaintiff in error has devoted much of the argument to demonstrate that the trial court erred in declining a request by him made to instruct the jury to render a verdict in his favor, if they believed the testimony, but this request was manifestly rightly refused. It involved a finding by the court as to weight of evidence and practically asked it to usurp the province of the jury, by determining the proper inference to be drawn from the evidence and deciding on which side lay the preponderance of proof. In so far as this request asked the court to instruct that under any hypothesis of fact, as a matter of law, the attaching creditor was entitled to a verdict, it can be more properly considered in reviewing the exceptions taken to the instructions given at the request of

the one, and the consequent refusal to give the converse propositions asked by the other party. It would lead only to confusion and repetition to follow the various assignments of error and review them separately. They group themselves under six headings : First, assertion of error in the charges given as to the legal effect of the sale to the Memphis firm; second, error in the instructions as to the general assignment; third, error as to the ruling with reference to the burden of proof to establish fraud; fourth, error in the charge as to the effect of the employment of Warten after the sale and the resale to Mrs. Warten ; fifth, error as to the effect of having included in the debt for which the sale was made the note dated June 10 for $2500 ; and, sixth, error as to the bearing on the rights of the parties, of the letter written by the Memphis firm to the Louisville firm, and the settlement had by the latter with Warten after the letter was received. The consideration of the controversies under these various headings will embrace all the errors assigned, and will dispose of every question in the case, except the twelve errors asserted to have been committed in the admission or rejection of testimony.

*First. The validity of the sale to the Memphis firm.*

The court charged that, under the law of Alabama, a debtor had the right to prefer a creditor, and that, if the sale was real and was made in good faith for a fair price — was honestly executed to extinguish the debt, and did extinguish it, and contained no reservation of any interest or benefit in favor of the vendor — it was valid and passed the property to the vendee; that the sale, if it possessed these enumerated qualities, would be legal, although any of the following facts might be found by the jury to have existed : (*a*) that the vendor was insolvent to the knowledge of the vendee ; (*b*) even although there was a fraudulent intent on the part of the vendor to defeat his other creditors, because, if the sale possessed the attributes necessary to make it valid, as the law permitted the preference under the conditions stated, the mere intention of the vendor to defraud his other creditors by giving a preference to one would not render the sale invalid; and (*c*) although its known effect and

necessary consequence was that the remaining creditors of the vendor would be unable to obtain the payment of their debts.

The correctness of these instructions depends necessarily upon the law of Alabama as interpreted and construed by the Supreme Court of that State, whose rulings in this regard will be followed here. *Union National Bank* v. *Bank of Kansas City,* 136 U. S. 233; *Peters* v. *Bain,* 133 U. S. 670. It was in consonance with this rule that in a given case we enforced the law of the State of Illinois, *White* v. *Cotzhausen,* 129 U. S. 329, and in another that of the State of Iowa. *Etheridge* v. *Sperry,* 139 U. S. 267. The instructions given as above recited were in direct accord with the settled law of Alabama. In *Pollock* v. *Meyer,* 96 Alabama, 172, it was held that:

"If the property conveyed by an insolvent debtor in payment of preëxisting debts does not materially exceed in value the amount of indebtedness actually owing and paid by the conveyance, and no benefit is reserved to the grantor, the conveyance is lawful as against his other creditors, regardless of the motives of the parties to the conveyance or of badges of fraud in the transaction."

On page 175 the court cites approvingly from the decision in *First National Bank of Birmingham* v. *Smith,* 93 Alabama, 97, as follows:

"An insolvent debtor may select which of his creditors, one or more, he will pay, and pay them in full, and thus disable himself to pay the others anything; and it makes no difference if the one or more preferred creditors know the effect of the transaction will be to deprive the debtor of all means with which to pay his other debts. Nor is the wish, motive, or intention of the debtor a material inquiry, if the requisite conditions exist. Those conditions, in a case like the present, are: First, the debt must be *bona fide* and enforceable, not simulated; second, the payment must be absolute, and, if made in property, must not be materially in excess of the debt.; third, no pecuniary benefit or consideration of value, other than the liquidation of the debt, must inure or be secured to the debtor.

. . . The true inquiry at last is, did the creditor bargain for and receive overpayment, or payment in excess of his just demand?"

The court further observed, on page 176, as follows:

"The principle of law settled by the decisions of this court is, that the payment of an antecedent debt by an insolvent debtor, by a conveyance of his property, rests upon entirely different grounds than when a cash or present consideration is paid. It matters not whether the grantor alone, or grantor and grantee both, devised and intended to get the advantage of other creditors, if, in fact, the effect of the transaction was solely to pay a debt honestly due, and the property was received by the creditor in payment of his debt at a fair and adequate price, and no interest or benefit reserved to the grantor debtor. 'If the transaction is not assailable on one of these grounds, fraud has no room for operation.' As was said in *Hodges* v. *Coleman*, 76 Alabama, 103: 'What injury can the motive do to a non-preferred creditor? The act, as we have seen, is lawful. Can human tribunals set aside a transaction, lawful in itself, because the actors had an evil mind in doing it? Can there be fraud in doing a lawful act, even though it be prompted by an evil malice or badges of fraud?'"

*Second. The effect of the general assignment.*

The error alleged to exist in the charge of the court as to the legal consequences of the general assignment and its effect on the sale to the Memphis firm, which was made a few hours before the general assignment, is equally unfounded. The instruction given substantially was that if the sale to the Memphis firm was valid, the making of the general assignment on the same day did not render it illegal. The decision of the Supreme Court of Alabama in *Ellison* v. *Moses*, 95 Alabama, 221, is decisive of the correctness of this instruction. In that case creditors of a partnership sought to have several conveyances which had been executed by the partnership declared parts of a general assignment subsequently executed. The court held, however, that:

"An insolvent debtor having, under repeated decisions of this court, the right to sell and convey property in absolute

payment of an existing debt, provided the price is fair and reasonable, and no use or benefit is reserved to himself, such absolute sale and conveyance will not, at the instance of other creditors, be declared and treated as part of a general assignment executed soon afterwards (Code, 1737), though executed in anticipation of it, and with notice on the part of the creditor that the debtor intended to make a general assignment."

In its opinion the court further said (p. 224):

" The law of this State permits an insolvent debtor to make preferences among his creditors in the payment of his debts, by an absolute sale or transfer of his property in discharge of such debts. He may convey the whole or any part of his property in payment of an antecedent debt, and if the price is reasonably fair, and there is no reservation of a benefit or trust in his favor, the sale is valid and will be sustained, whatever may have been the debtor's intentions, and though the preferred creditor knew of such intentions, and that the sale would leave the debtor unable to pay his other debts. That such preferences are allowable is settled by numerous decisions of this court. *Chipman* v. *Stern*, 89 Alabama, 207; *Hodges* v. *Coleman*, 76 Alabama, 103; *Crawford* v. *Kirksey*, 55 Alabama, 282; 3 Brick. Dig. 517. The statutory prohibition against preferences in general assignments (Code, 1737) does not operate upon an absolute and unconditional sale of a debtor's property to his creditors in payment of the debts due to them. This question, also, is well settled by the former decisions of this court. The general assignment, in which preferences or priorities of payment given to one or more creditors over the others are prohibited, implies the idea of a trust, under the operation of which there is a possibility of a reversion to the debtor of some interest in the proceeds of a sale of the property assigned. No such idea is involved in an unconditional sale of property in absolute payment and discharge of a debt. Here the debt is extinguished, and the debtor is stripped of all interest in the property sold. Such a sale is not within the purview of the statute, and if a preference is thereby effected, it is not such a preference as the statute prohibits. *Otis* v. *McGuire*, 76 Alabama, 295; *Danner* v. *Brewer*, 69 Alabama, 191; *Comer* v. *Constan-*

*tine,* 86 Alabama, 492. The result is, that the law as it now stands permits an insolvent debtor to prefer one or more of his creditors over the others in the payment of debts by a sale of property in satisfaction thereof, and prohibits preferences or priorities of payment in a general assignment by the debtor for the benefit of his creditors. Only the legislature can make the prohibition against preferences equally operative in both classes of cases. The courts must recognize and enforce the law as it exists. They cannot ignore distinctions created by the law-making power."

By recent legislation in Alabama the provisions of section 1737 of the Alabama code, upon which these rulings were made, have been amended, so that a conveyance substantially of all a debtor's property in payment of prior debts is put upon the same footing with conveyances for the security of debts. *Strickland* v. *Gay,* 16 South. Rep. 77, 78. The questions, however, here are obviously to be determined by the law of Alabama existing at the time the transactions occurred.

*Third. Burden of proof to establish fraud.*

The instruction complained of on this subject was that if the proof showed that the Memphis firm had an honest debt, and they purchased the stock at a fair and reasonable price in payment of that indebtedness, the burden was on the plaintiffs to show that a benefit or interest in the sale was reserved to Warten; in other words, that the transfer was fraudulent. It is urged that this instruction ignored the rule of evidence as to the presumption of law which arises from proof of circumstances of suspicion and badges of fraud, which, it is asserted, were shown in this case by the evidence offered in behalf of the Louisville firm. In *Curran* v. *Olmstead,* 101 Alabama, 692, it was said (page 694):

"When the transaction is assailed by an antecedent creditor, the burden rests on a creditor who has been preferred to prove the existence, amount, and justness of his claim, and when paid in property he must also prove that the property was taken at a price not materially below its fair market value."

The burden of proof to show fraud and notice of fraud was

on the party alleging fraud. *Hodges* v. *Coleman*, 76 Alabama, 103; *Pollak* v. *Searcy*, 84 Alabama, 259. See also *Jones* v. *Simpson*, 116 U. S. 609, 615. In *Pollak* v. *Searcy*, *supra*, the court said:

" If the facts of indebtedness and that the goods were sold in payment of such indebtedness at their reasonable fair value are established to the satisfaction of the jury, and if it be contended, in avoidance thereof, that the trade was simulated, that there was a secret trust or benefit reserved to the debtors, the burden was then on the contesting creditor to establish it."

So in *Roswald* v. *Hobbie*, 85 Alabama, 73, it was held that:

" As against creditors of an insolvent debtor, the one claiming as a purchaser must prove that he paid a valuable and adequate consideration; but is not bound to negative the reservation of a benefit to a debtor."

*Fourth. As to the effect of the employment of Warten after the sale and the resale to Mrs. Warten.*

The charges given by the court on this subject were as follows:

" If the jury find from the evidence, under the instructions given by the court, that Schoolfield, Hanauer & Co. made a valid purchase of the stock of goods in controversy from Henry Warten, then Schoolfield, Hanauer & Co. had a legal right to employ Warten for their benefit to assist in winding up the business, and turning the goods into money as promptly and economically as possible."

" If the jury find from evidence that prior to the 13th day of January, 1890, Henry Warten had been engaged for several years in an established and extensive business at Athens, Ala., and that he sold his stock of goods to Schoolfield, Hanauer & Co. in a valid way, it is but reasonable that Warten might be employed by Schoolfield, Hanauer & Co. as a clerk to assist in the winding up of the business for the benefit of Schoolfield, Hanauer & Co. Such circumstance is not of itself fraudulent."

" If the jury find from the evidence in this cause, under the instructions given by the court, that the sale by Henry Warten

to Schoolfield, Hanauer & Co. is valid, then Schoolfield, Hanauer & Co. had the legal right to give the stock of goods to Mrs. Warten or sell the same to her on such terms as they desired."

In considering the correctness of these instructions, we necessarily assume the *bona fides* of the sale made to the Memphis firm and its validity, except in so far as its legality may have been affected by the employment of Warten and the subsequent sale to his wife. But the proof on the subject of the circumstances which gave rise to the employment of Warten and the resale to Mrs. Warten was conflicting. The fact of the employment and resale, no question being made as to the reality of the transfer, could at best have been only competent evidence to be considered by the jury in determining whether or not a secret benefit was reserved to the debtor in the original transaction, which was the issue on this branch of the case. Certainly, if nothing else appeared but the mere employment of Warten, subsequent to the sale, to assist in the disposition of the goods and the getting in of the book accounts, such fact would not be a circumstance in itself sufficient to prove within the meaning of the Alabama law that the transaction was fraudulent. Even if, at the time of the sale, there had been an agreement to employ, such fact would not of itself have necessarily implied a reservation of benefit in favor of the seller so as to have rendered the sale invalid under the Alabama law. *Murray* v. *McNealy*, 86 Alabama, 234. Such also is the general rule. *Smith* v. *Kraft*, 123 U. S. 436; Burrell on Assignments, 6th ed. p. 471, § 343, and authorities there cited. Indeed, under the rule as announced in Alabama, the court could have affirmatively instructed that the employment of the vendor in a clerical capacity could not affect the validity of the sale. *Richardson* v. *Stringfellow*, 100 Alabama, 416, 422.

The instruction that if the original sale by Warten was valid the purchasers had a legal right to dispose of the property to Mrs. Warten, is within the principle of the decision in *Young* v. *Dumas*, 39 Alabama, 60, 62, where the court said — speaking of a gift, by a father to his daughter, of property

which the father had received from his son-in-law in payment of an indebtedness due from the son-in-law to the father — as follows:-

"Mr. Horn had the clear right to collect his demand, which we have seen was just, from his son-in-law, Mr. Dumas; and after he thus became the owner of the property, his right to give that property to the sole and exclusive use of his daughter, Mrs. Dumas, cannot be successfully controverted by the creditors of Mr. Dumas. As to them, the gift was harmless. That the effect may have been to delay, and, possibly, defeat all other creditors in the collection of their demands, cannot, of itself, avoid the sale."

It is argued that whilst these charges may not have been intrinsically erroneous they were yet illegal, because they singled out some of the strongest badges of fraud upon which the plaintiff relied, and weakened, impaired, or destroyed their force and weight as evidence; that they were argumentative deductions, the necessary effect of which was to obscure the force of the inferences of fraud which the jury might have deduced from the fact of the employment and the resale, and, therefore, practically prevented the jury in drawing its conclusions from giving due consideration to these matters. But it nowhere appears that the court instructed the jury that they might not, in reaching a determination upon the *bona fides* of the sale by Warten to the Memphis firm, and the question whether a secret benefit was reserved in his favor, consider such facts as the subsequent employment of Warten, and the sale thereafter to his wife. As a matter of fact, the portions of the general charge of the court set forth in the record make it clear that the question of reservation of a secret benefit to Warten in the sale, was particularly called to the attention of the jury, as necessary to be considered by them in arriving at a conclusion as to the validity of the transfer. We are unable to see that the charges in question had a tendency to cause the jury to regard the fact of the employment of Warten and the sale to his wife as not important to be weighed by them in passing upon the *bona fides* of the sale to the Memphis firm.

*Fifth. Error as to the effect of having included in the debt for which the sale was made the note dated June 10, for two thousand five hundred dollars.*

The three following instructions on the subject were asked and refused:

"33. If any part of the debt claimed by Schoolfield, Hanauer & Company against Warten as the consideration of the transfer of the goods to them is simulated or pretended, that fact would vitiate the whole transaction. If the jury find from the evidence that part of the consideration is composed of the note of Warten for $2500, which was due and payable to the Schoolfield Hanauer Company, a corporation under the laws of Tennessee, and that said note was taken from the account of said corporation and placed upon the account of the claimants for the purpose of increasing the account of Schoolfield, Hanauer & Company, that account to the extent of said $2500 would be simulated, and this would vitiate the transaction, and if the jury so find, their verdict should be for the plaintiffs.

"34. If part of the consideration of the transfer from Warten to the claimants is a note for $2500, payable to the Schoolfield Hanauer Company and owned by them, and if the said note was transferred to the account of Schoolfield, Hanauer & Company, and if said transfer was made for the purpose of increasing the firm's debt against Warten, so as to make it equal in amount to the value of the goods and property transferred by Warten to the claimants, the consideration for such transfer to the extent of said note for $2500 would be simulated, and this would vitiate the transfer, and if the jury so find the facts, their verdict must be for the plaintiffs."

"36. If the jury believe from the evidence that the promissory note for $2500, made by Henry Warten on June 10th, 1889, payable to the order of Schoolfield, Hanauer & Company, at the office of the Schoolfield Hanauer Company, four months after date, and endorsed 'The Schoolfield Hanauer Company, p'r W. W. Schoolfield, treasurer,' was taken and endorsed by said corporation, and it let said Warten have the amount thereof, less discount, being $———, by crediting his

account with said corporation for $————, as shown by said statements of said accounts in evidence in this case, then said draft became the property of said corporation, and it was an indebtedness due by said Warten to it; and if the jury further believe from the evidence that said indebtedness was transferred from the account of said Warten with said corporation to the account of said Warten with said firm on or about the 11th day of January, 1890, for the purpose of evading the law of the State of Alabama, which prohibits foreign corporations from doing business in the State of Alabama without known place of business and authorized agent therein, the jury would be authorized to find that said indebtedness was the property of and due to said corporation, and not said firm, when said alleged transfer of the stock of goods in dispute in this suit to said firm by said Warten was made, and should they so find, in that event their verdict should be for the plaintiffs."

They were rightly refused. There was no proof of any kind even tending to show the simulation of the note. It was certainly, under the undisputed proof, due by Warten; it was drawn to the order of the Memphis firm, who were, as endorsers, necessary parties to its negotiation. That firm had an obvious right, with the consent of the company by whom the paper had been discounted, to use it as a debt due them, and thus protect their endorsement. Nor was the sending of a note to Tennessee for discount, and its discounting in that State by the Memphis company, carrying on business in Alabama by the Memphis company. The second section of the fourteenth article of the constitution of Alabama, and the act of the legislature of 1886–7, pp. 102, 104, relied on by the plaintiff in error, have been held by the courts of Alabama not to have been intended to (as of course they could not) interfere with matters of commerce between the States, and to have no application to transactions such as that here under consideration. *Ware* v. *Hamilton Shoe Co.*, 92 Alabama, 145; *Cook* v. *Rome Brick Co.*, 98 Alabama, 409.

*Sixth. Error as to the bearing on the rights of the parties, of the letter written by the Memphis firm, and the settlement had by the latter with Warten after the writing of the letter.*

Much stress is placed by counsel on this proposition. The contention is that the Louisville firm having been induced to give an extension on the faith of the letter written them by the Memphis firm, the latter could not receive payment by sale, from the debtor, which created a preference, without operating a fraud upon the Louisville firm. To support this contention authorities are cited holding that when creditors have jointly agreed, each upon the faith of the other's promises, to extend the indebtedness of their co-debtor for a fixed and definite period, a party to such an agreement who secures an advantage to himself out of the mutual debtor's property, during such extended period, may be compelled to account for the property received and permit the other creditors to share *pro rata* with him. But the fallacy is not in the legal proposition, but in its application to the facts here considered and consists in treating the Memphis firm as consenting to and being bound by the terms of the extension granted to Warten by the firm in Louisville. There was no evidence even tending to so prove. The only connection of the Memphis firm with the settlement, even if all the disputed questions of fact were determined in favor of the firm at Louisville, was the letter from the Memphis firm, presented by Warten when the extension was made. But the letter could not give rise to the obligations contended for, since the extension granted by the Louisville firm was in conflict with the obvious intent of the letter. It stated that Warten, "through we believe no fault of his own, but owing to disastrous failure of crops in his own section, finds himself forced to ask for extension," and expressed a willingness to grant the extension provided the Louisville firm would do likewise. The extension referred to must necessarily have meant an extension to the next crop year, otherwise the letter was meaningless. The disaster calling for the extension was the crop failure, and the substantial results of the crop being realized by the end of December, it was self-evident that the extension proposed, and which the Memphis firm was willing to give, in conjunction with the Louisville firm, was one which would carry the debtor to another crop. This becomes more manifest when it is

considered that the extension was only to be asked of three creditors, the Louisville firm, the Memphis firm, and one other, leaving the other debts unextended. But the extension granted by the Louisville firm did not accede to this proposal, since it embraced short time acceptances for three thousand dollars, which they could only hope to be paid out of the avails of the disastrous failure of the crop which had by the terms of the letter given rise to the necessity for the extension. Doubtless it was this view of the relation of the parties which caused the court to instruct the jury that if the Louisville firm took short time paper from Warten in the hope of obtaining an advantage over the Memphis firm, they would have no right to complain because the Memphis firm overtook them in the race of diligence. Whether, however, this instruction was given because the court took this view of the letter and the legal effect of its unaccepted proposal, is immaterial. The entire charge is not in the record. The court may have expressed itself in this matter to the jury, in connection with observations possibly advanced in argument by counsel for plaintiffs in error upon their claim that the Memphis firm in the letter in question had sought to gain an advantage. And if such were the case, it was not error for the court to call the attention of the jury to the opposing view of the transaction.

These conclusions dispose of all the errors assigned which relate to the instructions given by the court, and leave only the exceptions taken to rulings admitting or rejecting testimony. They are twelve in number. We have examined them all, and content ourselves with saying that we find them either not well taken or of such a character on account of their immateriality as to create no reversible error.

*Affirmed.*