Samuel J. BUTLER, Donald H. Toomer and Roberta Toomer, Plaintiffs and Respondents,

v.

Oral J. WILKINSON, Edna Mae Wilkinson, and Tim Themy, Defendants and Appellants.

Pearl SHAW, Samuel J. Butler, Donald H. Toomer, and Roberta Toomer, Plaintiffs and Respondents,

v.

Oral J. WILKINSON and Edna Mae Wilkinson, Defendants and Appellants,

and

Stephen L. Christensen and James L. Christensen, individually and d/b/a W.C. Investment Company; State Savings & Loan Association; Tim Themy, a/k/a Themistoklis Kotranakis; Zions First National Bank; Edward P. Ramras; Hart, Schaffner & Marx, Inc.; Whitney Travel Service, Inc.; Knight Adjustment Bureau, Inc.; Gene Leo; Credit Bureau of Salt Lake; Dene R. Lawson and Helen Lawson, Defendants and Respondents.

No. 18486.

Supreme Court of Utah.

April 3, 1987.

Steven H. Gunn, Ray, Quinney & Nebeker, Salt Lake City, for defendants and appellants.

David H. Schwobe, Turner, Perkins & Schwobe, Salt Lake City, for Shaw.

W. Clark Burt, Callister, Duncan & Nebeker, Salt Lake City, for Zions First Nat. Bank.

Gary A. Weston, Bradford C. Nielson, Nielsen & Senior, Salt Lake City, for Christensen.

Francis J. Nielson, Arnovitz, Smith & Nielson, Salt Lake City, for Hart, Schaffner & Marx.

Tim Themy, Salt Lake City, for defendants and respondents.

Brent R. Chipman, McMurray, Anderson & McIntosh, Salt Lake City, for Ramras.

John D. Parken, Salt Lake City, for Butler and Toomer.

J. Franklin Allred, Salt Lake City, for Lawson.

STEWART, Associate Chief Justice:

## I. THE FACTS

### A. *Lower Court Proceedings*

This case started as two separate lawsuits. They were consolidated for trial and are here on a consolidated appeal. As will appear, the facts are complex and the legal issues both complicated and far-reaching in their effect. The principal issues are (1) whether judgment liens attached to land subject to an installment land sale contract continued in effect after the seller of the land retook the property from the buyer; and (2) whether the vendee's transfer of his interest in the land under the contract to the vendor constituted a fraudulent conveyance as to the vendee's judgment creditors under the Utah Fraudulent Conveyance Act. There are also a number of other substantive and procedural issues which must be resolved in this complex case.

The first case, *Butler v. Wilkinson*, designated Civil No. C79–3912 in the trial court, is a fraudulent conveyance case. On June 15, 1979, Samuel J. Butler, Donald H. Toomer, and Roberta Toomer, all judgment creditors of Tim Themy, filed a complaint against Oral and Edna Mae Wilkinson and Themy alleging that Themy's transfer of the subject land, his interest in an FCC broadcast license, and personal property consisting of miscellaneous broadcast and broadcast-related equipment was void as a fraudulent conveyance under § 25–1–2 of the Utah Fraudulent Conveyance Act because Tim Themy was insolvent at the time of the transfer. The plaintiffs also alleged that the transfers were void under § 25–

1–7 because they were made to hinder, delay, and defraud the plaintiffs' efforts to enforce their judgments against Themy. The complaint asked that Themy's transfer of property to the Wilkinsons be ruled a fraudulent conveyance and therefore null and void and that "the interest or interests of defendant Themy in the above described property be applied against the judgments of plaintiffs herein."

The second case, *Shaw v. Christensen*, is a judgment lien case. On September 13, 1979, the same plaintiffs as in *Butler v. Wilkinson*, joined by Pearl Shaw, filed a complaint against Tim Themy, Stephen L. and James Christensen, the Wilkinsons,[1] and a number of Themy's creditors seeking a declaration that their judgment liens attached to the subject land that the Christensens purchased from the Wilkinsons after they took it back from Themy. The Christensens purchased the property in question from the Wilkinsons after Themy and Wilkinson mutually terminated the installment land sale contract between them. This contract, with Themy as purchaser, was in default, and Themy, at Wilkinson's request, also quitclaimed his interest in the land to the Wilkinsons.

The plaintiffs in the second case also named the following judgment creditors of Themy as defendants to establish the priority of their judgment liens: Zions First National Bank; Edward P. Ramras; Hart, Schaffner & Marx, Inc.; Whitney Travel Service; Knight Adjustment Bureau, Inc.; Gene Leo; Credit Bureau of Salt Lake; and Dene and Helen Lawson. Zions, Ramras, Hart, Schaffner & Marx, the Lawsons and Gene Leo answered the complaint and requested determinations of the validity and priority of their liens. Gene Leo did not

---

**1.** Both of the Wilkinsons legally owned the subject property and both signed the various deeds involved herein. Oral J. Wilkinson, however, was the sole actor in the events described in this case. In fact, the trial court's memorandum opinions refer throughout solely to "Wilkinson." The findings of fact and conclusions of law refer to the "Wilkinsons" and impose judgment against both of the Wilkinsons.

In the same vein, although the subject property was deeded to Stephen L. Christensen and Robert P. Warmington, and although James L.

Christensen signed some of the required documents, Stephen L. Christensen was the acting party in these events. At some time prior to the conclusion of the trial, Warmington conveyed his interest in the property to James L. Christensen.

In this opinion, we generally, but not always where greater specificity may be appropriate, refer to the actions of Oral J. Wilkinson as though performed by the "Wilkinsons" and the actions of Stephen L. Christensen as though performed by the "Christensens."

appear at trial. Whitney Travel Service, Knight Adjustment Bureau, Inc., and Credit Bureau of Salt Lake did not answer or appear. Those defendants who did not appear at trial were defaulted, and any liens they might have had against the subject property were voided.

The Christensens filed a cross-claim against the Wilkinsons claiming damages for fraud and breach of warranty for their not defending Christensen's title to the land. In turn, the Wilkinsons counterclaimed against the Christensens to foreclose the Wilkinsons' trust deed because the Christensens ceased making payments on the note for the purchase of the land. The Christensens' cross-claim and the Wilkinsons' counterclaim have been settled.

In *Shaw*, the trial court held that the Christensens were good faith purchasers for value. The court, therefore, refused to impress judgment liens on the property in favor of the judgment creditors and quieted title to the land in the Christensens. The court also refused to decree a foreclosure of the Wilkinsons' trust deed on the ground that Oral J. Wilkinson's negligent omissions in explaining the status of the ownership of the land to the Christensens equitably estopped the Wilkinsons from foreclosing the trust deed against the Christensens, but that they were not sufficient to constitute actionable fraud. The trial court awarded the Christensens attorney fees of $25,682.05 for breach of warranty.

In *Butler*, the fraudulent conveyance case, the trial court ruled that Themy's conveyance to the Wilkinsons was a fraudulent conveyance under § 25–1–7 of the Utah Fraudulent Conveyance Act and imposed a constructive trust on the entire unpaid balance of the $600,000 purchase price the Christensens still owed the Wilkinsons for the subject property. The beneficiaries of the constructive trust were declared to be plaintiffs Samuel J. Butler and the Toomers and intervenors Pearl Shaw and Edward Ramras. In addition, the court awarded the same relief to Dene R. and Helen Lawson, Hart, Schaffner & Marx, Inc., and Zions First National Bank, all of whom were judgment creditors of Themy and were parties in the *Shaw* case (the lien case), but not the *Butler* case. The court also entered a personal judgment in the sum of $142,280.35 against the Wilkinsons and in favor of the same parties who were made beneficiaries of the constructive trust declared by the court. This amount apparently represents what Christensen had already paid to the Wilkinsons as earnest money, down payment, and partial payment on the note for the conveyance of the subject land. The judgment, however, was stayed pending payment of the remainder of the purchase price by the Christensens into the constructive trust.

The appellants, Oral J. and Edna Mae Wilkinson, appeal, *inter alia*, from the judgment and the imposition of the constructive trust. The plaintiffs in both the *Shaw* and *Butler* cases are hereafter usually collectively referred to as the respondents or the judgment creditors. The parties in *Shaw* cross-appeal the refusal of the court to impose liens on the property which is now in Christensens' ownership.

B. *The Transactions Giving Rise to the Lawsuits*

On May 26, 1976, Oral Wilkinson and his wife, Edna Mae, executed a uniform real estate contract to sell a parcel of land in Salt Lake County and radio broadcasting equipment located on the land to Tim Themy for $360,000. The contract required no down payment, nine percent interest, monthly installment payments of $1,000 for the first two years, and $4,000 per month thereafter until the purchase price and the interest were paid in full. Since the initial $1,000 monthly payments did not cover the monthly interest, which accrued at $2,700 for the first month alone, the total amount Themy was required to pay increased during the first two years as the unpaid interest was added to the principal. Themy made payments during the first eleven months of the contract, but paid nothing on the contract after June, 1977. As a result, Themy did not reduce the principal owed the Wilkinsons during the life of the contract. Nevertheless, the Wilkinsons initiated no formal contractual or judicial ac-

tions to forfeit or rescind the contract until June 5, 1978, when Themy quitclaimed the property back to the Wilkinsons and the parties entered into an indemnity agreement which nullified the land sale contract.

Themy, working with the Wilkinsons, did, however, bring legal proceedings to foreclose the interest Seagull Enterprises, Inc., had in the same property pursuant to two earlier executory contracts between the Wilkinsons and Seagull. One contract was for the sale of the same real estate as is involved in this case, and one contract was for the sale of radio broadcasting equipment and an FCC broadcast license. Both contracts were in the form of uniform real estate contracts. Seagull defaulted on both contracts after it made the required down payments to Wilkinson. Wilkinson gave Seagull notice after its default that its interests would be forfeited if the contracts were not brought current within five days. Seagull failed to do so, but Wilkinson took no further action against Seagull. Instead, he contracted to sell the land to Themy, who subsequently filed a suit and obtained a decree foreclosing Seagull's interests. That decree was affirmed in *Themy v. Seagull Enterprises, Inc.*, 595 P.2d 526 (Utah 1979).[2]

After June 1, 1977, Themy was in default under the Wilkinson-Themy contract. At the same time, he was suing to foreclose Seagull's interests in the suit mentioned above. In November or December 1977, Wilkinson was informed by Themy that he could no longer perform under the contract, and Oral Wilkinson asserts that he told Themy that he was "taking the property back," although, as previously stated, he neither gave proper notice of default under the contract nor initiated formal legal ac-

tion. Wilkinson did, however, lease the land to third parties for livestock pasture, collect the rents, pay the property taxes, and make several attempts to sell the property to third parties. Themy, on the other hand, continued to act as if he had an ownership interest, also attempting to sell the property to third parties.

In May, 1978, Stephen L. Christensen contacted Oral Wilkinson and expressed an interest in purchasing the subject property. On May 18, 1978, Christensen and Wilkinson met to negotiate the purchase of the property. Themy also appeared and actively participated in the negotiations. He signed the earnest money agreement as seller. A few days later, on May 25, 1978, Wilkinson also signed as "co-seller" the earnest money agreement, which described the subject property as the property "known as the O.J. Wilkinson and Themy property." At that time, Themy had been in default under the Wilkinson-Themy contract for approximately eleven months.

After Themy executed the first earnest money agreement, Christensen's realtors ordered a title report from Guardian Title Company. The report listed as exceptions to the title insurance commitment seven unsatisfied judgments in the approximate amount of $149,000 then docketed against Themy in Salt Lake County.[3] On May 31, 1978, Wilkinson and Christensen executed a new earnest money agreement which omitted Themy's name as a seller and showed no interest owned by him in the property. A new title report, prepared by a different title insurance company, McGhie Land Title Company, showed no reference to any of Themy's judgment liens or to any ownership interest claimed by Themy in the property. It did, however,

---

**2.** To enable Themy to foreclose Seagull's interest in the subject property and to the radio license and equipment, Wilkinson assigned to Themy, subject to full performance by Themy of all his obligations under the Wilkinson-Themy contract, the Wilkinsons' right to sue under the Seagull contracts. The assignment included the right to receive rent under the Wilkinsons' contract of sale to Seagull and the right to exercise the enforcement remedies under the contract. The assignment expressly reserved to the Wilkinsons, however, the legal title to the property. Although an unusual procedure, the assignment

appears to have been made solely to allow Themy to clear the title as against Seagull.

**3.** The value of the judgment liens on Themy's interest in the property as of June 5, 1978, when the contract was nullified, was $148,431.27, exclusive of statutory interest. The judgment of Samuel J. Butler and Donald and Roberta H. Toomer in the amount of $78,011 was docketed June 8, 1978, after the Wilkinson-Themy contract was nullified.

show a possible interest in Themy by reason of the *Themy v. Seagull Enterprises* suit. For that reason, the title company refused to issue a title insurance policy until Themy quitclaimed any interest he might have had in the property back to the Wilkinsons.

The title report did not resolve Christensen's questions about the status of the title to the land since he had been informed that the Wilkinsons had contracted to sell the land to Themy. Wilkinson attempted to allay Christensen's concern by stating that he had taken the property back because of Themy's default and assured Christensen that Themy had no claim to, or interest in, the property. In accord with the title company's requirement, Wilkinson obtained the quitclaim deed from Themy to assure formally the termination of Themy's interest. On June 5, 1978, Themy met with Wilkinson and his attorney and executed an indemnity agreement and the quitclaim deed. The indemnity agreement declared the real estate contract to be "null and void" and waived all of Themy's rights thereunder. Thereafter, on June 8, 1978, plaintiffs Samuel Butler and Donald and Roberta Toomer obtained a judgment against Themy for $78,011.

The earnest money agreement between the Wilkinsons and Christensens called for the Christensens to pay $25,000 down. That sum was paid June 15, 1978, and Wilkinson loaned the full amount to Themy the next day. Part of that sum was subsequently repaid. On July 27, 1978, the Wilkinsons and the Christensens closed the sale of the property by the Christensens assuming a first mortgage on the property in the approximate amount of $47,000, executing a note for the balance secured by a trust deed, minus the $25,000 down payment, and making a cash payment at closing of $57,752.23. Oral Wilkinson invested the $57,752.23 in Themy's business, Halogenics. The trial court found Halogenics to be Themy's alter-ego.

At the time of the execution of the Wilkinson-Themy contract, the following two judgments had been docketed against Themy in the District Court of Salt Lake County:

| JUDGMENT CREDITOR | DATE OF DOCKETING | AMOUNT OF JUDGMENT |
|---|---|---|
| Pearl Shaw | Sept. 19, 1975 | $30,054.84 |
| Dene R. and Helen Lawson | April 9, 1976 | $28,239.55 |

Subsequent to the execution of the contract, the following judgments were entered against Themy:

| JUDGMENT CREDITOR | DATE OF DOCKETING | AMOUNT OF JUDGMENT |
|---|---|---|
| Hart, Schaffner & Marx | Dec. 21, 1977 | $20,769.00 |
| Edward P. Ramras | March 15, 1978 | $58,087.30 |
| Zions First Nat'l Bank | April 10, 1978 | $13,278.72 |
| Samuel J. Butler, Donald H. & Roberta Toomer | June 8, 1978 | $78,011.00 |
| Gene Leo | Oct. 16, 1978 | $ 5,743.29 |

None of the above judgment creditors initiated execution proceedings upon Themy's interest in the property, whatever that may have been, either before or after his reconveyance of the property to the Wilkinsons.

C. *Trial Court Findings*

In its findings of fact, the trial court summarized in detail the nature and tenor of the negotiations for the sale of the land by Wilkinson and Themy to Christensen:

17. On or about May 18, 1978, negotiations were commenced by Stephen L. Christensen (d/b/a W.C. Investment) for the purchase of the property described in paragraph 9 above. Defendant, Oral J. Wilkinson, informed the realtors representing Christensens that Themy had an interest in the property. On May 18, 1978, a meeting was held between Stephen L. Christensen, Tim Themy, and Oral J. Wilkinson, together with the realtors representing Stephen L. Christensen. Christensen and Themy were the active participants in this meeting. Themy's attendance at said meeting was either upon his own initiative or upon the request of Mr. Wilkinson, and in either event, was with the approval and consent of Mr. Wilkinson. A proposed Earnest Money Receipt and Offer to Purchase was provided by the realtors upon which Themy made changes in the presence of Oral J. Wilkinson. At the termination of the meeting, Themy executed this Earnest Money Receipt and Offer to Purchase agreement in the amount of Six Hundred Thousand Dollars ($600,000.00), as the "Seller" without objection from Oral J. Wilkinson. This Agreement related only to the sale of the real property without reference to the broadcast license or electronic equipment. Approximately one week later, Oral J. Wilkinson also executed the Earnest Money Receipt and Offer to Purchase as "Co-Seller."

In its first memorandum opinion, filed before the findings were entered, the trial court stated that a determinative legal issue was whether the plaintiffs' judgment liens could be "cut off by a forfeiture, rescission, or mutual abandonment of the contract which [occurred] after the attachment of the liens to the judgment debtor's equitable interest in the land by virtue of the [uniform real estate] contract." The court held that although the land had appreciated in value, the "only equity [Themy] had in the contract consisted of the difference between the purchase price and what he had paid" and that his transfer to the Wilkinsons was therefore for fair consideration. "He gave that up in return for a cancellation of a debt in the same amount."

The trial court also held that the liens of Themy's judgment creditors were cut off by the Wilkinsons' transfer to Christensen because Christensen was a good faith purchaser for value; however, the court held the Wilkinsons liable for the total amount of the judgments against Themy, except the late-filed judgment of Samuel Butler and the Toomers, because Oral J. Wilkinson and Themy had colluded in the transfer of the property. The trial court imposed a constructive trust in favor of the judgment creditors on the Wilkinsons' receipt of the entire unpaid amount of the purchase price from the Christensens and entered a personal judgment against the Wilkinsons for the monies the Christensens had already paid. The constructive trust and judgment therefore made the entire $600,000 purchase price of the land, less the amount of the first mortgage in the amount of approximately $47,000 which was assumed by the Christensens, available to satisfy Themy's judgment creditors, except Butler and the Toomers.

The trial court, however, ruled in a supplemental memorandum decision that the transfer from Themy to Wilkinson was a fraudulent conveyance because it was not made in good faith, but rather to avoid the judgment liens of Themy's creditors, and that Butler and the Toomers should therefore be included as beneficiaries of the constructive trust. The court stated:

[T]he termination of the [Wilkinson-]Themy contract was not made in good faith, that fact being illustrated by [1] Themy's participation in the Christensen sale negotiations, [2] Themy's behavior in the Seagull suit and in relation to possession of the property, [3] the timing of the termination (after notice to Themy and Wilkinson that the judgment liens would hinder the Christensen sale), and [4] the routing of the down payment proceeds to Themy under peculiar circumstances that appear to have been designed to keep the money safe from his creditors, among other factors.

. . . .

The court is now persuaded that, absent good faith, the transfer back to Wilkinson, in the absence of a prior valid forfeiture (also found by the court) does constitute a fraudulent conveyance.

The court further found:

[T]he sole purpose for the execution of said Quit-Claim Deed and Indemnity Agreement was to prevent Judgment lien creditors from executing on their Judgments and thereby interfering with the sale by Edna Mae and Oral J. Wilkinson of the property subject to Stephen L. Christensen, doing business as W.C. Investments. The court further finds that Defendants Wilkinson and Tim Themy acted in collusion and in bad faith with the specific purpose of then effecting either a termination or rescission of the Uniform Real Estate Contract of May 26, 1976, for the specific purpose and with the specific intent of defeating any rights which Tim Themy's creditors might otherwise have had against the subject property.

In sum, the trial court ruled that (1) Themy and Wilkinson terminated the installment land sale contract by "abandonment, rescission and/or forfeiture"; (2) the judgments against Themy that were docketed while the contract was in force or prior thereto imposed liens against his interest in the property and were not extinguished by his release or quitclaim of his interest to the Wilkinsons which was held to be collusive and to provide the basis for monetary relief to the lienors from the Wilkinsons, even though the land was then owned by the Christensens; (3) Themy's transfer of his interest to the Wilkinsons constituted a fraudulent conveyance because it was not made in good faith but to defeat the claims of Themy's judgment creditors; and (4) Christensen was a bona fide purchaser for value of the property and therefore the judgment liens were extinguished when he purchased the property. On the basis of the last ruling, the court quieted title in the Christensens.

The judge who tried the case, Judge, now Justice, Christine Durham, wrote the memorandum opinions but left the trial bench before she could sign the formal findings of fact and conclusions of law. In her stead, the presiding judge of the district court, the Honorable Bryant H. Croft, signed the findings and conclusions on the assurance of Justice Durham that they were accurate.

On this appeal, the Wilkinsons contend that the trial court erred in ruling that (1) the termination of Themy's interest under the uniform real estate contract and the Wilkinsons' reacquisition of Themy's interest was a fraudulent conveyance; (2) a constructive trust for the benefit of the judgment creditors should be imposed on the proceeds of the Wilkinsons' sale to the Christensens; and (3) judgment could be entered against the Wilkinsons for money damages and a constructive trust imposed on their proceeds not yet received from the Christensen sale, even though the plaintiffs had neither sought such relief nor alleged an equitable cause of action in their pleadings. Finally, the Wilkinsons argue that the findings of fact and conclusions of law are invalid because they were signed by a judge other than the one who tried the case. On the cross-appeal, the respondent judgment creditors argue that the trial court erred in ruling that their judgment liens against the land were cut off.

## II. VALIDITY OF A JUDGMENT LIEN AGAINST A VENDEE'S EQUITABLE INTEREST IN A LAND SALE CONTRACT AFTER THE RETURN OF THAT INTEREST TO THE VENDOR

Because it is foundational to our discussion of the Wilkinsons' fraudulent conveyance argument, we address first the judgment creditors' argument on their cross-appeal that Themy's relinquishment of his interest under the uniform real estate contract did not extinguish their judgment liens against the property. Specifically, the judgment creditors contend that a vendee's voluntary transfer of his or her interest in an installment land sale contract to the vendor does not extinguish liens against the vendee's interest.

Three issues must first be addressed: (1) whether judgment liens attach to a vendee's equitable interest under an installment land sale contract; (2) if so, what was the extent of Themy's equitable interest, if any at all, to which the liens attached; and (3) if Themy had an equitable interest to which the liens attached, was Themy's transfer of that interest to the Wilkinsons voluntary, and if so, did the liens survive the transfer?

Although judgment liens did not attach to equitable interests at common law, a number of courts have held that judgment liens do attach to equitable real estate interests created pursuant to land sale contracts.[4] *See, e.g., Fulton v. Duro,* 107 Idaho 240, 245, 687 P.2d 1367, 1372 (Idaho Ct.App.1984), *aff'd,* 108 Idaho 392, 700 P.2d 14 (1985); *Mutual Building & Loan Association v. Cullins,* 85 N.M. 706, 707, 516 P.2d 677, 678 (1973), *overruled in part on other grounds, Marks v. Tucumcari,* 93 N.M. 4, 595 P.2d 1199 (1979); *Cascade Security Bank v. Butler,* 88 Wash.2d 777, 780, 567 P.2d 631, 632–33 (1977). See Annot., 1 A.L.R.2d 727 (1948) for cases pro and con.

■ Section 78–22–1, U.C.A., 1953, provides that docketed judgments are liens upon "all the real property of the judgment debtor ... in the county in which the judgment is entered...." In this state, the statutory term "real property" in § 78–22–1 includes the equitable interest of a vendee under an installment land sale contract, and a judgment against a vendee docketed in the county where the land is located imposes a lien on the vendee's interest. *Bill Nay & Sons Excavating v. Neeley Construction Co.,* 677 P.2d 1120, 1121 (Utah 1984). *See generally, Lockhart Co. v. Anderson,* 646 P.2d 678 (Utah 1982); *Utah Cooperative Association v. White Distributing & Supply Co.,* 120 Utah 603, 237 P.2d 262 (1951), *rev'd on other grounds,* 2 Utah 2d 391, 275 P.2d 687 (1954).

■ It follows that the liens of Pearl Shaw, Dene R. and Helen Lawson, Hart, Schaffner & Marx, Edward P. Ramras, and Zions First National Bank attached to whatever interest Themy had under the contract. The judgment of Samuel J. Butler and Donald H. and Roberta Toomer, docketed June 8, 1978, did not impress a lien on the subject land because it was docketed after Themy's interest in the land had been terminated by the indemnification agreement. *See Bill Nay & Sons Excavating,* 677 P.2d 1120; *Fulton v. Duro,* 107 Idaho at 246, 687 P.2d at 1373.

We turn next to the question of what equitable interest, if any, Themy had to which the judgment creditors' liens could attach. That requires that we analyze the relative interests of a vendor and a vendee in the land under a land sale contract, and specifically the interest of Themy and the Wilkinsons prior to the termination of Themy's interest.

■ Under an installment land sale contract, the vendor retains legal title as security for the purchase price of the property. *Oaks v. Kendall,* 23 Cal.App.2d 715, 73 P.2d 1255 (1937); *Marks v. City of Tucumcari,* 93 N.M. 4, 595 P.2d 1199 (1979). Nevertheless, as a general proposition, the vendee is treated as the owner of the land. *C & J Industries, Inc. v. Bailey,* 618 P.2d 58, 59 (Utah 1980); *Rush v. Anestos,* 104 Idaho 630, 634, 661 P.2d 1229, 1233 (1983). Thus, a vendee may mortgage his or her equity in the land, *see Lockhart Co. v. Anderson,* 646 P.2d at 679–80; *Rush v. Anestos,* 104 Idaho at 634, 661 P.2d at 1233, assign it to a third party as security for a loan, *see Wiscombe v. Lockhart Co.,* 608 P.2d 236 (Utah 1980); *Jeffs v. Citizens Finance Co.,* 7 Utah 106, 319 P.2d 858 (1958), or sell the interest by way of an assignment. *See Hadlock v. Showcase Real Estate, Inc.,* 680 P.2d 395 (Utah 1984).

---

4. The author of the annotation located at 1 A.L.R.2d 727 (1948), states: "Following the well-established common-law principle that equitable interests are not subject to execution or judgment liens, apart from statute, the general rule appears to be that the interest of a vendee under an executory contract for the purchase of real property is not subject to execution or to the lien of a judgment." *Id.* at 728.

By retaining the legal title, the vendor retains an important right in the land. The doctrine of equitable conversion characterizes the seller's interest as an interest in personalty and not as one in realty, whereas the vendee's interest under the executory contract is deemed an interest in realty.[5] The doctrine gives a vendee the right to obtain a decree of specific performance from a court of equity. But the characterization of the vendee as "owner" of the land and of the vendor as having no interest in the land is not wholly accurate. The vendor's retention of the legal title is usually coupled with a contract right to forfeit the vendee's interest and to take back the vendee's interests if the vendee defaults. *E.g., Cutright v. Union Savings & Investment Co.,* 33 Utah 486, 94 P. 984 (1908). The vendor also has an interest that he can sell or mortgage that is measured by the amount the vendee owes under the contract.

The vendor's interest is similar to the security interest of a purchase money mortgagee. In *Nelson v. Stoker,* 669 P.2d 390 (Utah 1983), we explained the priority position a purchase money mortgagee has over judgment creditors of the purchase money mortgagor:

Equity and justice justify the protection afforded a vendor who parts with his property on the faith that his mortgage or trust deed securing purchase monies loaned to the vendee is entitled to priority over any preexisting claims which may be asserted against the vendee-mortgagor. To grant a preexisting judgment lien creditor a preference over a vendor's purchase money mortgage would be to bestow on that judgment lien creditor a pure windfall at the expense of a vendor. Thus, in accord with the overwhelming weight of authority, we hereby adopt and

follow the doctrine that grants a special priority to purchase money mortgages. *Id.* at 394.

A similar concept applies to a vendor's interest under a land sale contract. In *Oaks v. Kendall,* 23 Cal.App.2d 680, 73 P.2d 1255 (1937), the court stated:

"Where the owner of land contracts to sell it, and to give a conveyance upon the payment of the purchase money, and retains the title in himself, he is sometimes spoken of as holding a vendor's lien, and he may proceed to sell the property for the payment of the purchase money in like manner as if he had conveyed the title. But as was said in *Avery v. Clark,* 87 Cal. [619], 625, 25 P. 919 [22 Am.St. Rep. 272]: 'Properly speaking, a vendor's lien does not exist until the vendor has parted with his title. So long as he retains the title, he cannot be said to have any *implied* lien upon the land. *The security which he has then for the purchase money is created by express reservation, and cannot be impaired by any act of the vendee. This is an express lien, existing by virtue of a contract executed between the parties,* ... Such a lien is open and manifest to the world, ... For such a lien, equity makes no special provision, but leaves the parties to rely upon the contract which they have executed between themselves.'"

*Id.* at 723, 73 P.2d at 1258–59 (quoting *Kent v. Williams,* 114 Cal. 537, 541, 46 P. 462, 462–63 (1896)) (emphasis in original).

Pomeroy described the nature of a vendor's security interest under a land sale contract as follows:

In the latter, although possession may have been delivered to the vendee, and although under the doctrine of conversion the vendee may have acquired an equitable estate, yet the vendor retains the *legal title,* and the vendee cannot

---

**5.** Under the doctrine of equitable conversion, a vendee under a uniform real estate contract obtains an equitable interest in the land itself, even though the vendor retains the legal title. The vendee is said to convert the monetary interest that he has in the property to an interest in real estate so that he may invoke the powers of an equity court to compel specific performance of the real estate contract. By a parity of reasoning, the vendor under such a contract is deemed to have converted his interest in the land that is the subject of the contract to a monetary or legal interest, which would have supported a money judgment for damages caused by a breach. *In re Estate of Willson,* 28 Utah 2d 197, 199–200, 499 P.2d 1298, 1300 (1972). The doctrine also serves other important interests.

prejudice that legal title, or do anything by which it will be divested, except by performing the very obligation on his part which the retention of such title was intended to secure—namely, by paying the price according to the terms of the contract.

3 Pomeroy, *Equity Jurisprudence* § 1260 (4th ed. 1919), *quoted in* 3 *American Law of Property* § 11.73, at 184 (1952).

Thus, a vendor's security interest, like the interest of a purchase money mortgagee, protects the vendor's or owner's property rights from being appropriated by creditors of a vendee or by buyers or mortgagees of the vendee's interest. In short, the vendor's security interest or lien [6] provides the critical security to a seller that is essential for an installment land sale contract to be a commercially reasonable way of selling real estate. *See* 5 H. Tiffany, *The Law of Real Property* § 1462, at 460–66 (3d ed. 1939 & Supp.1986), and authorities cited therein. *See also Bradford v. Morrison*, 212 U.S. 389, 396, 29 S.Ct. 349, 351, 53 L.Ed. 564 (1909); *Cochran v. Cutler*, 39 Ill.App.3d 602, 606–607, 350 N.E.2d 59, 61–62 (1976); *Stewart v. Berry*, 84 Ga. 177, 10 S.E. 601 (1890); *Davis v. Vass*, 47 W.Va. 811, 815–16, 35 S.E. 826, 827–28 (1900); 46 Am.Jur.2d *Judgments* § 294, at 499 (1969).[7]

Prior to Themy's and Oral Wilkinson's execution of the indemnity agreement declaring the land sale contract void, the Wilkinsons' vendors' security interest had a value equal to the purchase price of $360,000 plus the accrued unpaid interest under the contract of approximately $53,700, for a total of approximately $413,700. Neither Themy nor his judgment creditors, nor anyone claiming through Themy, could divest the Wilkinsons of their entitlement to that value.

A vendee, however, is entitled to the appreciated value of the property over the contract purchase price as long as his or her interest has not been forfeited. *Utah State Medical Association v. Utah State Employee's Credit Union*, 655 P.2d 643, 644 (Utah 1982); *Cochran v. Cutler*, 39 Ill.App.3d at 607, 350 N.E.2d at 62; *MGIC Mortgage Corp. v. Bowen*, 91 N.M. 200, 202, 572 P.2d 547, 549 (1977). Therefore, although Themy created no "equity" in the property by reducing the principal owed the Wilkinsons, Themy was entitled to the equity represented by the difference between what he owed under the contract and the appreciated fair market value of the property.

The Wilkinsons contend on appeal that there was no evidence of the fair market value of the land at the time Themy's interest terminated and therefore conclude that Themy had no equity in the land. We think otherwise. It is evident that the land was worth more than the value of the Wilkinsons' vendors' security interest. The $600,000 sale price to the Christensens is clearly some evidence of the market value of the land. Both Themy and the Wilkinsons, in arm's length negotiation with Christensen, agreed to that price in the first earnest money agreement, and the Wilkinsons and Christensen agreed to it again in the second earnest money agreement. Beyond that, since the actual sales price was an established value that was in excess of the Wilkinsons' interest, they are in no position to complain that that amount is unreasonably high. In sum, we believe that the record supports the conclusion

---

**6.** The term "vendor's lien" seems to have stuck even though it is inaccurately used before the vendor parts with the title. Until then, it is not, in fact, a lien at all, but rather a retained interest in the land that is derived from the vendor's retention of the fee title. *See Oaks v. Kendall*, 23 Cal.App.2d 715, 73 P.2d 1255 (1937), as quoted in the text, *supra*.

**7.** 46 Am.Jur.2d *Judgments* § 294, at 499, states:
The general rule is that the equitable lien of a vendor for the unpaid purchase money for land sold and conveyed is paramount to liens of judgments recovered against the vendee. Sometimes this rule is applied where the judgment lien is perfected by a judgment creditor having notice of the existence of the vendor's lien, but there are also cases in which the vendor's lien is given preference even though the creditors were without notice thereof. Moreover, this priority is not affected by the levy on the land of executions issued on the judgments.

that the fair market value of the land at the time the indemnification agreement was executed was $600,000.[8] Since the sales price to the Christensens exceeded the value of the Wilkinsons' vendors' security interest by $186,300, that amount was the value of Themy's equity interest subject to the judgment creditors' liens, if Themy's interest was not terminated.

The Wilkinsons contend, however, that the liens of the judgment creditors were extinguished by the Wilkinsons' forfeiture of Themy's interest in December 1977, when they claim they told Themy they were taking the property back because of his default. If that theory were correct, only Pearl Shaw's and the Lawsons' liens would have attached to Themy's interest. That position is untenable. Oral Wilkinson did not give the kind of notice necessary to forfeit Themy's interest. Even on their own version of the facts, the Wilkinsons failed to notify Themy of the exact amount by which he was in default and what he had to do to bring the contract current. Furthermore, neither party treated the contract as terminated, the most obvious example being Themy's and the Wilkinsons' holding themselves out to be co-sellers of the property to the Christensens in May 1978. The trial court held that the contract was not terminated until June 5, 1978, and there is abundant evidence to support that finding.

The judgment creditors, on the other hand, contend that the Wilkinsons' and Themy's termination of the contract did not cut off their liens because the termination was a voluntary agreement between the parties and not a true forfeiture. On that premise, the judgment creditors claim on their cross-appeal that the trial court erred in quieting title to the subject land in the Christensens and that their liens are still viable against the land even under the Christensens' ownership. The parties rely on different lines of authority and different characterizations of the facts in support of their positions.

As a foundational matter, we note that a judgment lien has no greater dignity in property law than the nature of the property interest to which it attaches. In *Dahl v. Prince*, 119 Utah 556, 561, 230 P.2d 328, 331 (1951), this Court held that "[n]either an attaching creditor nor an execution creditor is in the position of a bona fide purchaser for value." *Accord, Wiltshire v. Warburton*, 59 F.2d 611, 614 (4th Cir.1932); 1 G. Glenn, *Fraudulent Conveyances and Preferences*, § 19, at 37 (rev. ed. 1940); *Restatement (Second) of Trusts*, § 308 (1959); 46 Am.Jur.2d *Judgments* § 239, at 469 (1969). See also *Kartchner v. State Tax Commission*, 4 Utah 2d 382, 294 P.2d 790 (1956), where this Court held in effect that a judgment lien was a derivative interest of the judgment debtor's interest in land and the judgment lienor did not have the status of a purchaser.

As a general proposition, therefore, it follows that when a vendor *forfeits* a vendee's interest under an installment land sale contract, a judgment creditor's liens and mortgage liens which attached prior to the forfeiture are also terminated. *Wiscombe v. Lockhart Co.*, 608 P.2d 236, 238 (Utah 1980); *Peterson v. Siebrecht*, 188 Minn. 272, 276–77, 247 N.W. 6, 7 (1933); *Farmers & Merchants State Bank v. Stageberg*, 161 Minn. 413, 415, 201 N.W. 612, 613 (1925). *See also Sanders v. Ulrich*, 250 Or. 414, 443 P.2d 231 (1968); *Kendrick v. Davis*, 75 Wash.2d 456, 452 P.2d 222 (1969) (mortgage lien extinguished by forfeiture); 46 Am.Jur.2d *Judgments* § 315, at 511 (1969). In *Wiscombe* we specifically held that a mortgagee's lien on a vendee's interest was extinguished by the seller's forfeiture of the vendee's interest.

It does not follow, however, that every termination of a vendee's interest under an installment land sale contract also results in termination of judgment liens against the vendee's interest. A vendee who voluntarily assigns or sells his

---

**8.** The trial judge made no finding in her memorandum opinions as to the fair market value of the land at the time of the termination of Themy's interest. The formal findings of fact and conclusions of law, however, found that the land was worth $600,000 at the time of the termination and $1,100,000 at the time of trial. We think the latter figure is irrelevant.

equitable interest to a third person or who rescinds the contract under which his equitable interest arises does not by the assignment, sale, or rescission extinguish creditors' judgment liens that attached during the vendee's ownership of the equitable interest. *Bradford v. Morrison*, 212 U.S. 389, 396, 29 S.Ct. 349, 351, 53 L.Ed. 564 (1909); *First National Bank v. Hays*, 7 Idaho 139, 142, 61 P. 287, 288 (1900); *Fulton v. Duro*, 107 Idaho at 246, 687 P.2d at 1373; *Walters v. Defenbaugh*, 90 Ill. 241 (1878); *Thomassen v. De Goey*, 133 Iowa 278, 110 N.W. 581, 582 (1907); *Stewart v. Berry*, 84 Ga. at 181–82, 10 S.E. at 601; *Neil v. Tenny*, 42 Maine 322, 326 (1856); *Hook v. Northwest Thresher Co.*, 91 Minn. 482, 485, 98 N.W. 463, 464 (1904); *Commercial Bank & Trust Co. v. Jordan*, 85 Mont. 375, 385, 278 P. 832, 834 (1929); *Morris v. Mowatt*, 2 Paige (N.Y.Ch.) 586, 589–90 (1931); *Peeke v. Fitzpatrick*, 74 Ohio St. 396, 401–402, 78 N.E. 519, 520 (1906); *Maxwell v. Leeson*, 50 W.Va. 361, 363, 40 S.E. 420, 420–21 (1901); *Davis v. Vass*, 47 W.Va. at 816, 35 S.E. at 827–28; 46 Am.Jur.2d *Judgments* § 297, at 501 (1969). *See also Consolidated Finance Corp. v. Thorp*, 168 Colo. 144, 152–53, 450 P.2d 320, 323–24 (1969); *Cochran v. Cutler*, 39 Ill.App.3d 602, 350 N.E.2d 59 (conveyance to a third party); *Hoffman v. Semet*, 316 So.2d 649, 653 (Fla.1975); 49 C.J.S. *Judgments* § 485, at 938 (1947); 46 Am.Jur.2d *Judgments* § 315 (1969). *But see Welsh v. Richards*, 41 Mich. 593, 593–94, 2 N.W. 920, 921 (1879); 92 C.J.S. *Vendor & Purchaser* § 315, at 207 (1955) (citing *Welsh v. Richards, supra*). Nor, for that matter, is a judgment lien against the vendor's interest extinguished by the vendor's sale of that interest to a third person. *Utah Farm Production Credit Association v. Wasatch Bank*, — P.2d —, 53 Utah Adv.Rep. 11 (March 19, 1987); *First Security Bank v. Rogers*, 91 Idaho 654, 657, 429 P.2d 386, 389 (1967).

The judgment creditors argue that Themy's relinquishment of his interest in the land by means of the indemnity agreement and the quitclaim deed constituted a voluntary transfer of his interest, not a forfeiture, and that since the judgments of the respondents were docketed before the transfer, except for the judgment obtained by Butler and the Toomers, they continued in effect even after Themy lost his interest in the land to the Wilkinsons.

 Whether Themy's execution of the quitclaim deed and the indemnity agreement nullifying the real estate contract constituted a forfeiture, voluntary rescission, or even a sale, is the key to whether the judgment liens survived. The trial court's ruling can be read both ways, as a forfeiture and/or as a voluntary rescission. Specifically, the court held that the termination of the contract was an "abandonment, rescission and/or forfeiture."

The judgment creditors contend that whether the termination was voluntary or involuntary on the vendee's part is the critical test for determining whether the termination was a forfeiture. We agree that voluntariness is an important factor, but that is too narrow a test. Surely the purpose for an involuntary transfer is also highly relevant. In general, the law makes the determination of the survivability of judgment liens on a vendee's interest under an installment land sale contract depend upon the circumstances under which a vendee in default agrees to the termination of his interest. *See Welsh v. Richards*, 41 Mich. 593, 2 N.W. 920; *Davis v. Rede Realty Co.*, 41 Wash.App. 527, 704 P.2d 1250 (1985). A defaulting vendee may, for example, in good faith voluntarily agree to forfeit his interest under a contract in default to avoid the expense of a legal proceeding to which he has no valid defense, without destroying the vendor's right to a forfeiture of judgment liens against the vendee's interest. *Welsh v. Richards*, 41 Mich. at 593, 2 N.W. at 921.

In this case, Themy was in default for an extended period and was unable to bring the contract current. The initial agreement for the sale of the property to the Christensens was structured so that Themy and the Wilkinsons would have been co-sellers. When the Christensens objected because of the judgments against Themy, the transaction was restructured, and Themy was removed as a seller.

When the Christensens signed the earnest money agreement, Wilkinson loaned Themy $25,000, only part of which was repaid at the time of trial, and directed the payment of the $57,752.23 from the funds that the Christensens paid at the closing to Themy's alter-ego company, Halogenics. Thus, one could infer that Themy received compensation for the transfer. Indeed, the trial court found that the payment to Themy by Wilkinson was designed to keep the money safe from his creditors.

It is clear that Oral Wilkinson and the Christensens knew about the judgment liens against Themy and that Themy signed the indemnification agreement and quitclaim deed because the Christensens would not agree to the sale in the manner originally contemplated. Indeed, had they done so, the liens of Themy's judgment creditors that attached to his interest might have remained viable after the Christensens purchased the land. *First National Bank v. Hays*, 7 Idaho 139, 142, 61 P. 287, 288 (1890); *Cochran v. Cutler*, 39 Ill.App.3d at 606, 350 N.E.2d at 62.

■ We conclude that although the Wilkinson-Themy contract was voluntarily terminated for the purpose of defeating the judgment liens, the termination was not a bona fide forfeiture by Wilkinson. It follows that the liens of Themy's judgment creditors, except for the lien of Butler and the Toomers which did not attach to the subject property, survived the nullification of the real estate contract.[9] Had the Wilkinsons retained the land, the liens would have continued in force.

Nevertheless, the trial court held that the liens were not valid as against the Christensens because the Christensens were good faith purchasers for value. The judgment creditors on their cross-appeal contend that the trial court erred in this ruling and that they should be able to enforce their liens against the property.

■ We begin with the widely accepted principle stated in 46 Am.Jur.2d *Judgments* § 297, at 501 (1969):

The lien of a judgment against a person for whose benefit another holds the legal title to lands is not effective as against a subsequent bona fide purchaser from the trustee without notice of the trust. Similarly, a lien against the interest of a person under an executory contract of purchase will not affect a purchaser in good faith without notice from one who holds the title.

The Christensens were aware that there were judgments against Themy and were apprised of the Wilkinson-Themy contract. To be in good faith, they had a duty to make a reasonable investigation as to the existence of Themy's rights under the contract. *Modrok v. Marshall*, 523 P.2d 172, 174 (Alaska 1974). In *Pender v. Dowse*, 1 Utah 2d 283, 290, 265 P.2d 644, 649 (1954), the Court held that inquiry must be made of a reliable source likely to disclose the facts and that it is not sufficient to inquire only of a source who has a motive to misrepresent the facts. The Christensens' inquiry was directed to Oral Wilkinson, who had such a motive. But there is also much more in this case that bears upon the good faith question. It is undisputed that Themy acquired no equity in the property by any payment on the purchase price and that Themy was in default and had been for a number of months. Oral Wilkinson informed Stephen Christensen of these facts. In addition, Christensen demanded that Themy execute a quitclaim deed to the Wilkinsons. Themy also signed the indemnity agreement which provided that the "Uniform Real Estate Contract referred to herein shall be null and void and the Indemnitor [Themy] waives all right in the said contract." Further, Oral Wilkinson told Christensen that the Wilkinsons were entitled to a forfeiture of Themy's interest because of his default under the contract

---

9. It is arguable that because the Wilkinsons had actual notice of Themy's judgment liens, they had a duty to give notice to the judgment lienors of the forfeiture. *Cf. Hadlock v. Showcase Real Estate, Inc.*, 680 P.2d 395 (Utah 1984); *Kendrick v. Davis*, 75 Wash.2d 456, 452 P.2d 222 (1969).

*Jeffs v. Citizens Finance Co.*, 7 Utah 2d 106, 319 P.2d 858 (1958), however, is a little closer in point and is to the contrary. Nevertheless, the argument has not been raised, and we therefore decline to decide it.

and that Wilkinson was pursuing that course. Christensen also consulted his own lawyer about the state of the title.

In light of that and other evidence, the trial court based its finding of Christensens' good faith on the ground that they reasonably believed either that Themy had never had an interest in the property, or that any interest had been cut off prior to the attachment of any judgment liens. Christensen purchased the property believing in good faith that it belonged to Wilkinson. *That finding did not appear to have been disputed by any party at trial.*

(Emphasis added.) We conclude that there is substantial evidence to support the trial court's finding. Furthermore, this finding was not, in any event, really disputed by the parties at trial.

Finally, the trial court's award of relief to the judgment creditors for the "collusive termination" of the liens has no basis in the law. The closest cognizable cause of action is a claim under the fraudulent conveyance statutes, which we address below. In sum, the liens of all the judgment creditors are unenforceable.

## III. FRAUDULENT CONVEYANCE

Samuel J. Butler and Donald H. and Roberta Toomer obtained a judgment against Themy that was docketed June 8, 1978, after Themy's relinquishment of his interest in the land to the Wilkinsons. Thereafter, Butler and the Toomers filed *Butler v. Wilkinson* against Themy and the Wilkinsons under the Utah Fraudulent Conveyance Act. Pearl Shaw and Edward P. Ramras were allowed to intervene as parties plaintiff, even though neither of them filed complaints in intervention. The trial court held that Themy's transfer of his vendee's interest under the uniform real estate contract to the Wilkinsons was a fraudulent conveyance as to the plaintiffs and the plaintiffs in intervention and as to the judgment creditors who had only an-

swered in *Shaw v. Christensen* but had not sought to intervene in *Butler.*

The law has long held that transfers of property designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the creditors. *See, e.g.,* 13 Elizabeth 1 (1570) Ch. 5; *Twyne's Case,* 3 Coke 80a, 76 Eng. Rep. 809 (1601); *Clements v. Moore,* 73 U.S. (6 Wall.) 299, 312, 18 L.Ed. 786 (1867); *Smith v. Holland,* 298 Ky. 598, 603–604, 183 S.W.2d 647, 649 (Ky. Ct.App.1944); *Rainier National Bank v. McCracken,* 26 Wash.App. 498, 505–506, 615 P.2d 469, 474 (1980). Utah's Fraudulent Conveyance Act, § 25–1–1, *et seq.,* establishes several different grounds for setting aside a debtor's transfer of property as a fraudulent conveyance.[10]

Section 25–1–7 is the critical provision in this case. It states:

> Every conveyance made, and every obligation incurred, with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors is fraudulent as to both present and future creditors.

The first issue we address is whether Themy's nullification of the uniform real estate contract and his execution of the quitclaim deed to the Wilkinsons was a "conveyance" within the meaning of that term as used in § 25–1–7. Section 25–1–1 defines the word "conveyance" to include "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or an encumbrance." Given the purpose of the Act, § 25–1–1 should be construed with liberality so as to reach all artifices and evasions designed to rob the Act of its full force and effect in preventing debtors from paying the just claims of their creditors.

The Wilkinsons argue that the transfer from Themy to the Wilkinsons was a forfeiture and therefore was not a conveyance. They assert that a forfeiture is an involuntary loss of property and that a conveyance is defined in terms of volun-

---

**10.** These include conveyances by an insolvent, § 25–1–4, conveyances by persons in business, § 25–1–5, conveyances by persons about to incur debts, § 25–1–6, and conveyances to hinder, delay, or defraud creditors, § 25–1–7.

tary acts on the part of the transferor. For the most part, § 25–1–1 refers to acts that are voluntary, although there may be some occasions where inaction or involuntariness with respect to the creation of a lien or encumbrance may also constitute a conveyance. In any event, for reasons discussed above, we have held that the transfer of Themy's interest was not a forfeiture, but rather a voluntary conveyance and a "transfer" as that word is used in § 25–1–1.

▪ It remains to be determined whether Themy's transfer to the Wilkinsons of Themy's interest was for the purpose of hindering, delaying, or defrauding his judgment creditors. To make a conveyance fraudulent under § 25–1–7, the defendant must have an actual fraudulent intent, *Mohar v. McLelland Lumber Co.*, 95 Idaho 38, 42, 501 P.2d 722, 726 (1972), unlike § 25–1–4, which deals with transfers of insolvent debtors and requires no actual intent. *Meyer v. General American Corp.*, 569 P.2d 1094, 1096 (Utah 1977).

▪ The trial court ruled that because Themy's transfer had the effect of cancelling his debt for the contract price of the property, the transfer was for good and adequate consideration. The rule that a debtor may prefer a creditor and that a creditor may seek a preference from the debtor is of long standing. Since territorial days, we have held to that rule, although the common law rule is of even more ancient origin. Later, the common law rule was codified.[11] *Pettit v. Parsons*, 9 Utah 223, 227, 33 P. 1038, 1039 (1893), held that "a preference, when the assignor acts in good faith, may be given in the exercise of a lawful right, and will not affect the [viability of the] conveyance. It is a right which results from the absolute ownership of property." *See also Lund v. Howell*, 92 Utah 232, 67 P.2d 215 (1937); *Weyeth Hardware & Manufacturing Co. v. James-Spencer-Bateman Co.*, 15 Utah 110, 47 P. 604 (1897). In *Commercial National*

*Bank v. Page & Brinton*, 45 Utah 14, 27, 142 P. 709, 714 (1914), this Court stated:

In this state any insolvent or failing debtor may prefer a creditor or a class of creditors. The trust fund theory does not prevail in this jurisdiction to the extent that a debtor, though insolvent, may not prefer some of his creditors.

The Supreme Court of Mississippi in *Eldridge, Dunham & Co. v. Phillipson*, 58 Miss. 270, 280 (1880), stated the rule and part of its rationale, as follows:

[P]references to creditors are valid if they be *bona fide* and reserve no benefit to the debtor. The right to make a preference results from the dominion which the owner has over his property; it is a part of his proprietorship.

*See also Reed v. McIntyre*, 98 U.S. (8 Otto) 507, 25 L.Ed. 171 (1878).

▪ Proof that a transferee of property knows that the transferor-debtor has preferred the transferee over other creditors or that the transferee actively sought the preference from the debtor does not support the conclusion that the transferee lacks good faith under § 25–1–7. *Smith v. Whitman*, 39 N.J. 397, 405, 189 A.2d 15, 20 (1963). The rationale for this position, adopted by a number of courts, was stated by Professor Corbin:

At common law it was not illegal for a debtor to pay one of his creditors in full even though he did not have enough left to pay his other creditors in full or even in part. Such a payment was not, and is not now, a fraudulent conveyance. The payment is merely the performance of an existing legal duty. Nor is it illegal for the debtor to transfer property as security for an existing debt; *the value of the property in excess of the debt remains available to other creditors.* The conveyance of property to a creditor in satisfaction of an existing debt *is a fraudulent conveyance only in case its value is in excess of the debt* and the purpose of the debtor is to keep that excess out of the hand of his other creditors.

---

11. The Uniform Fraudulent Conveyance Act, which was enacted in this state in 1925, codified the common law. 37 Am.Jur.2d, *Fraudulent*

*Conveyances* § 88, at 772 (1968). *See* 1925 Laws of Utah ch. 42.

6A *Corbin On Contracts* § 1467, at 566 (1962) (emphasis added, footnote omitted). *See also Bamberger v. Schoolfield*, 160 U.S. 149, 16 S.Ct. 225, 40 L.Ed. 374 (1895); *Cole v. Commissioner*, 297 F.2d 174, 175 (8th Cir.1961); *Arnold v. Hadgis*, 102 Cal. App.2d 88, 91, 226 P.2d 641, 642 (1951); *Blumenstein v. Phillips Insurance Center, Inc.*, 490 P.2d 1213, 1221–22 (Alaska 1971); 1 G. Glenn, *Fraudulent Conveyances and Preferences*, §§ 289, 289a (rev. ed. 1940); 37 C.J.S. *Fraudulent Conveyances* § 245, at 1072 (1943).

The Wilkinsons, therefore, had the right, as did every other creditor of Themy, to protect themselves by taking a preference over other creditors.[12] But the value of what the Wilkinsons took was far in excess of the value that can be considered a legitimate preference. In the language of Professor Corbin, "The value of the property in excess of the debt remains available to other creditors," which, in this case, amounts to approximately $186,300.

The remedy provided by the Act for a fraudulent conveyance is the voiding of the conveyance. § 25–1–8. That remedy is not available, however, when the property has been transferred from the fraudulent transferee to a third-party purchaser for value without "notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor."[13] § 25–1–13. Since Christensens did not have that intent, the conveyance to them cannot be voided.

Nevertheless, the law does not require that the wronged parties go empty-handed. The proceeds from the sale of the fraudu-

lently conveyed land which are in excess of the purchase price under the Themy-Wilkinson contract plus interest under the contract are recoverable because they have been paid into court.

Because the land could not be recovered to satisfy the plaintiffs in the fraudulent conveyance action, it was appropriate for the trial court to impose a constructive trust to prevent the Wilkinsons from unjustly enriching themselves at the plaintiffs' expense. *See United States v. Lansing*, 272 F.Supp. 170, 174–75 (N.D.Cal. 1967); *Pedro v. Soares*, 18 Cal.App.2d 600, 604–605, 64 P.2d 776, 778–79 (1937); *Ferguson v. Hillman*, 55 Wis. 181, 12 N.W. 389 (1882). If the funds that are impounded or might yet be due the Wilkinsons under the contract are less than $186,300, then a personal judgment may be entered against the Wilkinsons for the deficiency. *State ex rel. v. Nashville Trust Co.*, 28 Tenn.App. 388, 422–23, 190 S.W.2d 785, 798–99 (1944). The issue of which parties are entitled to share in the constructive trust or a judgment against the Wilkinsons is discussed below.

### IV. PLEADING FAILURES

Although the Wilkinsons acknowledge that a constructive trust may be imposed against a fraudulent transferee in appropriate circumstances, they contend that the trial court erred in doing so because that relief was not sought in the pleadings. They cite a number of old cases from other jurisdictions for the proposition that the failure to seek money damages in

---

12. In fact, there was no preference with respect to the value of the Wilkinsons' vendors' security interest because the liens of Themy's judgment creditors never attached to that interest. See the discussion *supra* on a vendor's interest under a land sale contract.

13. Generally, when a transfer is held void as a fraudulent conveyance, the creditors look to the fraudulently conveyed property under § 25–1–15. In this case, however, the land was not in the hands of a fraudulent transferee, but was owned by the Christensens. Section 25–1–13 deals with property that is fraudulently conveyed, but held by innocent third persons. That section provides that the provisions of the Act

do not affect the title of a purchaser for value without notice of the fraud. The trial court expressly found Christensen to be a bona fide purchaser, and we have affirmed that ruling. The creditors cite *Meyer v. General American Corp.*, 569 P.2d 1094 (Utah 1977), for the proposition that under the Utah Fraudulent Conveyance Act, constructive notice of a grantor's fraudulent intent can defeat a purchaser's good faith status. Assuming that the dictum in *Meyer* that constructive notice of fraud is sufficient under the Act, our finding of good faith on the part of the Christensens is not necessarily inconsistent with their having actual notice of Themy's creditors' claims against him.

a claim based upon a fraudulent conveyance precluded the award of money damages, namely, *Riverside Brick Co. v. Wheatley*, 92 Md. 410, 48 A. 715 (1901); *Chatterton v. Mason*, 86 Md. 236, 37 A. 960 (1897); *Hy-Lo Unit & Metal Products Co. v. Ryon*, 21 Cal.App.2d 38, 68 P.2d 393 (1937); and *Wright v. Salzberger*, 121 Cal. App. 639, 9 P.2d 860 (1932).

Their argument is plainly without merit. These cases all antedate the adoption of the modern rules of pleading and procedure first embodied in the Federal Rules of Civil Procedure and later adopted by most of the states, including Utah in 1950. The cases reflect the severity of the old code pleading, a position abandoned long ago.

■ Rule 54(c)(1) of the Utah Rules of Civil Procedure provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." That rule requires the courts to be liberal in awarding appropriate relief and to award all appropriate relief justified by the facts developed as long as the failure to request a particular form of relief does not prejudice a party in the preparation or trial of the case. *Taylor v. E.M. Royle Corp.*, 1 Utah 2d 175, 176–77, 264 P.2d 279, 280 (1953). If there is no prejudice, it is necessary only that the relief granted be supported by the evidence and be a permissible form of relief for the claims litigated. *Combe v. Warren's Family Drive-Inns, Inc.*, 680 P.2d 733, 735 (Utah 1984).

Rule 54(c)(1) has been utilized in a variety of contexts to afford litigants appropriate relief, including relief that is different from the type demanded in the complaint. Thus, injunctive relief has been granted even though damages were prayed for and vice versa. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2664, at 163 (2d ed. 1983). That same principle applies here with respect to the constructive trust.

■ But the rule is otherwise as to the judgment creditors who failed to intervene in the fraudulent conveyance case. Rule 54(c)(1) cannot dispense entirely with the necessity that a claimant make some claim in the lawsuit against the defendant. The trial court held that all Themy's judgment creditors who participated as parties in the lien case could also recover in the fraudulent conveyance case, even though they had not moved to intervene and were never parties in the separate case of *Butler v. Wilkinson*. Those parties were Zions First National Bank, Hart, Schaffner & Marx, and the Lawsons. We hold that was error. A court may not grant relief to a nonparty. Clearly, the relief afforded was not responsive to the claims asserted in the lien case by the judgment lienors. *Combe v. Warren's Family Drive-Inns*, 680 P.2d at 735. There is no basis for affording any relief to Hart, Schaffner & Marx, Zions First National Bank, or the Lawsons.

■ Finally, the Wilkinsons also assert that Pearl Shaw and Edward P. Ramras are not entitled to any recovery in the fraudulent conveyance case, even though the trial court granted their motions to intervene, because they failed to file complaints in intervention and Ramras did not file a written motion to intervene. We agree that they should have filed a complaint in intervention, but their failure to do so was not prejudicial. The complaint filed by Butler and the Toomers alleged only one count. The defendants knew precisely what issues were being litigated. Indeed, the defendants made no objection at trial to the intervention. On similar facts, we held in *Behrens v. Raleigh Hills Hospital, Inc.*, 675 P.2d 1179, 1182 (Utah 1983), that failure to offer an amended complaint on a motion to amend was not fatal to the amendment.

## V. VALIDITY OF THE FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Wilkinsons argue that the findings of fact and conclusions of law in this case are not valid because they were signed by a judge other than the trial judge who heard the case. The trial judge who heard the case resigned before the final, formal findings of fact, conclusions of law, and judgment were prepared. Before resigning, the

**1264**

trial judge wrote and signed a lengthy, detailed memorandum opinion and a supplemental memorandum opinion, which set forth the findings of fact and conclusions of law in great detail. By themselves, they would have been sufficient for deciding all the material issues in this case. The formal findings of fact, conclusions of law, and judgment were subsequently signed by the presiding judge of the district court and are generally consistent with the two memorandum opinions, except for the amount of the damage award against the Wilkinsons, which must now be recomputed on remand in any event.

Rule 63(a) of the Utah Rules of Civil Procedure provides that where because of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties required to be performed "after a verdict is returned or findings of fact and conclusions of law are filed," then a successor judge may perform those duties. We have ruled that the term "disability" includes the resignation of a judge. *State v. Kelsey*, 532 P.2d 1001, 1006 (Utah 1975).

▮ Since the trial court's written memorandum opinions were by themselves sufficient as findings of fact and conclusions of law and since the formal findings prepared by counsel diverged from the opinions only with respect to matters that are not material or must be readdressed in any event on the remand of this case, we find no error in the presiding judge's signing of the formal findings and judgment.

## VI. CONCLUSION

We reverse and remand for entry of a new judgment and decree in accordance with this opinion.

The parties are to bear their own costs.

HALL, C.J., and BOYD BUNNELL, SCOTT DANIELS and RONALD O. HYDE, District Judges, concur.

HOWE and DURHAM, JJ., having disqualified themselves, do not participate herein.

ZIMMERMAN, J., does not participate herein.

BUNNELL, DANIELS and HYDE, District Judges, sat.